# THIRD DISTRICT, 1901.

### T. C. TAYLOR v. L. W. GOODRICH.

Decided February 24, 1897.

**1.—Contempt—Criticism on Judicial Action.**

Whether libelous criticism of judicial action, published after the final disposition of the case in which it was had, can be punished as contempt of court, questioned but not decided.

**2.—Judicial Action—Liability for Damages—Contempt.**

District Courts, in proceedings for contempt, exercise a general jurisdiction over a subject committed to them, and hence are acting judicially in determining what facts authorize them to render judgment.

**3.—Same.**

For the exercise of judicial discretion, when sitting as a court over a subject within its jurisdiction, a judge can not be held lable in damages to one claiming to be injured as the result of the official conduct, whatever his motives.

**4.—Same.**

The action of a district court in punishing for contempt the author of a libelous criticism upon its proceedings made after their termination, if erroneous in law, was still a judicial act, determining a question within its general jurisdiction which could not render the judge subject to an action for damages.

**5.—Contempt—Pardon by Governor.**

A proceeding of a court imposing punishment for contempt is not a criminal case in which, by the Constitution and statutes, the Governor of the State has power to pardon.

Appeal from McLennan. Tried below before Hon. Sam. R. Scott. [This case was designated as one to be reported, but was inadvertently omitted from the proper volume.]

*Baker & Campbell,* for appellant.

*Alexander & Atkinson,* for appellee.

FISHER, CHIEF JUSTICE.—This is an action by appellant, Taylor, against Judge Goodrich in damages for false imprisonment. A general demurrer was sustained to the petition, and, the appellant declining to amend, his case was dismissed, with judgment in favor of appellee that he go hence with his costs.

The petition alleges that the plaintiff was a practicing attorney and that the defendant, Goodrich, was the judge of the Nineteenth Judicial District, embracing the county of McLennan, and then proceeds as follows:

"That while defendant was acting as judge as aforesaid, and heretofore, to wit, on the 22d day of June, 1894, C. M. King, Frank Dean, I. C. Puckett, Chance Edwards, and Jack Box, of said Coryell County, charged with the murder of Ed. Cash, in said Coryell County, by affidavit before P. S. Woodard, justice of the peace of precinct number 1, said Coryell County, petitioned defendant as such judge for the writ of habeas corpus, alleging, among other things, that they were illegally restrained of their liberty by John W. Hammach, the sheriff of said Coryell County, by virtue of certain writs issued by said justice of the peace, and praying for their discharge from the further custody of said sheriff. That the defendant, on the day and year last aforesaid, granted to said named petitioners the writ of habeas corpus and issued the same to the sheriff of Coryell County, commanding him to bring each of said named petitioners before him (the defendant) in the city of Waco, on Monday, at 9 o'clock a. m., June 25, 1894. That said sheriff of Coryell County, acting in pursuance of said writ of habeas corpus, executed the same on the 25th day of June, 1894, by bringing before defendant C. M. King, Chance Puckett, and Chance Edwards (the presence of the other named petitioners having been waived). That defendant, while sitting in chambers on the 26th day of June, 1894, set free and discharged all of said named petitioners charged with the murder of Ed. Cash except ——.

"Third. That the People's Voice, a weekly newspaper published in Gatesville, Coryell County, Texas, by G. L. Goodman, the editor and proprietor thereof, in its issue of July 3, 1894, editorially criticised the said L. W. Goodrich, defendant, for discharging the said alleged murderers of Ed. Cash, substantially as follows:

" 'You might as well say that black is white as to undertake to make some people in Coryell County believe that Judge Goodrich acted honestly and conscientiously in the Cash case. * * * Judge Goodrich's decision in the Cash case has done Coryell County more harm than the murder itself. The former was an outrage on an individual, the latter a most damnable outrage on a whole community and upon justice itself. * * * Things are coming to a pretty pass when a

district judge in Texas can be persuaded (?) to turn loose on a community a lot of men charged with a villainous murder, without even investigating the evidence in the case. People will have their opinion in such cases, and they have them in this one, and they are not at all complimentary to Judge Goodrich.'

" 'THE CASH CASE.

" 'There was an unexpected turn in the Cash case last week. The habeas corpus hearing was taken up before Judge Goodrich, of Waco, the State being represented by County Attorney Arnold and T. C. Taylor, and the defendants by W. W. Hair, S. B. Hawkins, and H. N. Atkinson. The record as taken before Judge Woodward was submitted as evidence in the case, but Judge Goodrich refused to read it, and would not permit it to be read in his hearing. He told the attorneys that they could state in their argument all the salient points in the record; but when this had been agreed to, and County Attorney Arnold proceeded to comment on the testimony of Frank Jones, the judge stopped him and said he would not hear that portion of the record commented upon, as he did not believe a word of Jones' statement. The State was ruled against on every point of the ground, and after hearing two or three defense witnesses, which were the defendants and their relatives, the judge rendered a decision turning all the prisoners loose except Jones and Love. This was a great deal more than was expected, and the feeling in Coryell County is running high and Judge Goodrich and those parties who have figured so conspicuously in this matter are being severely condemned on every hand. After hearing the decisions, the officers and attorneys for the presecution were considerably wrought up and expressed their opinion pretty freely. To add insult to injury, Judge Goodrich had them brought before him to answer a charge of contempt of court, for daring to criticise his decision in the case. They were not fined, however, but were permitted to return home to tell their people how they had been treated. There is one thing that is evident, Judge Goodrich acted hastily and unadvisedly in this case, or he was unduly influenced by the statements of overzealous attorneys and friends of the defendants. If he claims to have based his decision on the facts in the case, he must admit that he got all he knew of the facts from the attorneys for the defense, for he refused to investigate the record at all and would not permit the prosecution to read the record in his hearing. He virtually said that he did not believe a word of the record presented by the State, and proceeded to release these defendants on their own statements and statements made by the wife and daughter of one of them. We do not claim that these defendants were the murderers of Ed. Cash, but we do say there is ample evidence in the record implicating them to bind them over to await the action of the grand jury, and nine-tenths of the people of Coryell County believe the same thing. Judge Goodrich may have acted honestly in the matter, but it looks very much like a put-up job to turn these men loose on the community without due process of law. If the judge acted honestly he is a very

poor judge of law, and if he acted otherwise he must have been fixed, or unduly influenced by these parties who have worked day and night for the last six or eight weeks to prevent justice being done to the murderers of Ed. Cash. We believe, and nine-tenths of the people in Coryell County believe, that these parties ought to have been held until the grand jury met, and we believe further that the ends of justice have been knowingly and willfully defeated by the decision rendered at Waco. The decision was rendered at about 4 p. m., Tuesday, but C. M. King sent his wife word at about 11 a. m. the same day that they would all be turned loose and he would be home next day. Dispatches were received here at 2 o'clock stating that all the prisoners except Love would be turned loose. How can these facts be explained unless the decision had previously been agreed upon. It can't be done, and the people of Coryell County will always believe that Judge Goodrich knew what his decision would be before the case was called. These men were justly indignant at the judge's action, and they had a right to be, and none of them ever thought of making political capital out of what they said. Their expressions were of just indignation at a judicial crime that had been committed against Coryell County, and they little thought or cared what the result would be.   *   *   *.'

"That the foregoing editorials were published on the 3d day of July, long after the said King and others were discharged by defendant as aforesaid, their cause tried and determined in chambers, and the defendant's court adjourned, with nothing left for defendant to do in and about said cause.

"Fourth. That heretofore, to wit, on the 6th day of July, 1894, the defendant, while such judge, caused to be entered an order in the minutes of said District Court of said Nineteenth Judicial District, directing the clerk of said court to issue a writ of attachment, directed to the sheriff of Coryell County, Texas, commanding him to attach the bodies of J. L. Goodman, charged with publishing, and J. H. Arnold and the plaintiff herein, with inciting and causing, said publications in the People's Voice as aforesaid, and to bring said Goodman, Arnold, and this plaintiff before the defendant to show cause why they should not be held in contempt of defendant's court by reason of said publications. That in pursuance of said order, entered as aforesaid, the clerk of said court, on the said 6th day of July, 1894, issued said writ of attachment and heretofore, to wit, on the 7th day of July, 1894, said sheriff of Coryell County, Texas, executed said writ of attachment in the town of Gatesville, Coryell County, Texas, by arresting, seizing and taking into his possession the body of plaintiff, as ordered by said writ of attachment, and on the 9th day of July, 1894, brought the body of plaintiff before defendant, acting as judge of said Nineteenth Judicial District, sitting in the city of Waco, McLennan County, Texas.

"Fifth. That plaintiff, on said 9th day of July, 1894, upon his trial charged with contempt of defendant as aforesaid, answered under oath to the jurisdiction of defendant's court, because said publications were

about a cause not then pending before defendant's court as aforesaid, and among other things answered that he was not guilty of causing or inciting said publications, nor was he in any way responsible therefor, nor had he any interest in said newspaper. Defendant, upon the 9th day of July, 1894, upon hearing the answer of plaintiff and the evidence had upon the trial of said cause, which evidence supported and in no respect differed from plaintiff's said answer, adjudged him guilty of contempt, as charged in said order, of inciting and causing said publications, and fixed his punishment at three days confinement in the county jail of McLennan County, Texas, and the payment of a fine of $100, and caused to be entered an order committing plaintiff to the custody of the sheriff of McLennan County, Texas, for the execution of said order of commitment. That said sheriff, acting in pursuance of said order of commitment, July 9, 1894, seized and took plaintiff into his possession and custody, and lodged plaintiff in the county jail of McLennan County, Texas, to serve said three days in jail and to pay or lay out said fine in jail, and held him in said county jail.

"Sixth. That while plaintiff was detained in said jail as aforesaid, James S. Hogg, then Governor of the State of Texas, on the 10th day of July, 1894, directed a telegram to the sheriff of McLennan County, Texas, directing him to suspend the executing of said order of commitment until he, the said Governor, could make further inquiry into the facts upon which said commitment was based, and upon the refusal of the sheriff of McLennan County to suspend the execution of said commitment, on the 10th day of July, 1894, the said James S. Hogg, Governor of the State of Texas as aforesaid, issued his proclamation of pardon, setting aside both fine and imprisonment adjudged by said defendant, and fully and unconditionally pardoned plaintiff of said fine and imprisonment and ordered said sheriff of McLennan County to release plaintiff from further custody.

"Seventh. Plaintiff avers that said publications upon which said fine and imprisonment for contempt of defendant's court were based were published, as aforesaid, about said cause of C. M. King and said other petitioners (for habeas corpus) charged with the murder of Ed. Cash as aforesaid, a cause not then pending, but one that had been tried and determined, and defendant's court, before whom said C. M. King and others were tried, in chambers, as aforesaid, had been duly adjourned. That while plaintiff denies that he instigated, caused or in any manner incited said publications, as is hereinafter pleaded, he alleges that, in so much as said publications were about a cause settled and determined as aforesaid, the newspaper—the People's Voice—had a right to criticise the defendant's judicial action, and for the abuse thereof was answerable in libel only, and not for contempt of court, and that defendant therefore had no jurisdiction over the person of plaintiff for contempt of court, and so fined and imprisoned plaintiff as aforesaid without having any jurisdiction whatsoever over his person, and plaintiff here now

avers that the said judgment fining and imprisoning plaintiff for contempt as aforesaid was null and void and not before a court of law, but before the defendant, L. W. Goodrich.

"Eight.   Plaintiff avers that he did not incite or cause said publication, nor contribute to its production in any wise whatever, nor did he have any interest in said newspaper; that he did not know any such publication as aforesaid or of like character would be made in the People's Voice or elsewhere, and as a law-abiding citizen and as an officer of the court by reason of his being an attorney at law, he at all times respected and upheld the dignity of courts and under no circumstances would have intentionally placed himself in contempt of court. Wherefore he says that defendant exceeded his jurisdiction, if any he had, which is denied, in imposing said fine and imprisonment for contempt of court, because there was no evidence of criminality or contempt that warranted the commitment of plaintiff, and defendant's judgment of said commitment was a nullity, and unauthorized by law, and was not the act of a court, but of the defendant, L. W. Goodrich.

"Ninth.   Plaintiff avers that the defendant adjudged plaintiff guilty of contempt as aforesaid and fined and imprisoned him therefor as aforesaid, thereby exceeding his jurisdiction, in that under the law the defendant could only fine or imprison the plaintiff, and not do both.

"Tenth.   Plaintiff avers that after he had been committed to the custody of said W. L. Burke, sheriff, and by him placed in jail on the 9th day of July, 1894, as aforesaid, upon the request of plaintiff and his friends, James S. Hogg, the Governor of the State of Texas, first on the 10th day of July, 1894, ordered said Burke, sheriff as aforesaid, to suspend the enforcement of said judgment for contempt as aforesaid, and upon the refusal of said sheriff to suspend the execution of said judgment, James S. Hogg, then the Governor of the State of Texas, fully pardoned plaintiff of said fine and imprisonment, and ordered that plaintiff be released.   That at the time of the attempted suspension of said judgment as aforesaid, that James S. Hogg, then the Governor of the State of Texas, might have time and an opportunity to inquire into and investigate the causes of the incarceration of plaintiff, and at the time of the full pardon of plaintiff and his release ordered by said Governor, who it is here alleged was the duly and legally elected Governor of the State of Texas and had the right to suspend the execution of said order of commitment or pardon the plaintiff as aforesaid, the defendant, not acting as`a court, but as an individual and in his individual capacity, resisted, opposed, ignored, and disrespected the action of the Governor of Texas, and by word of mouth and in writing, not as a court, but in his individual capacity, directed and commanded the said W. L. Burke, then sheriff as aforesaid, to pay no attention to the said action of the Governor of Texas, but to hold plaintiff in jail until he satisfied the judgment of defendant's court, and that the defendant threatened the said W. L. Burke with violent action in case he did release plaintiff from jail.   That the said W. L. Burke was desirous of

releasing plaintiff upon his pardon as aforesaid, and would not have held him in custody had it not been for the threats, orders, and directions of the defendant, and it is here averred that after plaintiff's pardon as aforesaid defendant's action was that of an individual and wholly unauthorized by law, and that plaintiff's detention was without authority and null and void.

"Eleventh. Plaintiff avers that defendant's action as aforesaid in fining and imprisoning him as aforesaid and detaining him in jail after duly pardoned was without lawful authority and null and void, and was the result of malice and a violent temper. That defendant was very angry on account of said publications; and in his anxiety to avenge himself willfully, wantonly, and maliciously, and without any reasonable or probable cause or lawful authority, and against the will of plaintiff (notwithstanding his frequent demands for freedom) the defendant, on the 9th day of July, 1894, had plaintiff imprisoned as aforesaid and kept, held and detained him in prison until 9 o'clock a. m. of the 11th day of July, 1894, when plaintiff was released upon his petition for habeas corpus to the Court of Criminal Appeals of the State of Texas.

"That plaintiff's imprisonment and detention in prison was tyrannical and contrary to the laws of the State of Texas and against plaintiff's will, by means whereof plaintiff was prevented from transacting his ordinary business or going where he pleased.

"Plaintiff avers that he has always conducted himself as an upright, honest, peaceable and law-abiding citizen, and that his imprisonment aforesaid, not only on account of himself, but his wife and children, caused him great trouble, mental and physical anguish, and the deepest of humiliation. That he sustained a great loss of time in consequence of said imprisonment and was exposed to great costs, and here avers that on account of defendant's malicious and reckless regard for the law, the liberty of the citizen and the rights of plaintiff, defendant willfully and wantonly contrived to injure the credit, fair name, reputation and character of plaintiff, to his total damage the sum of $15,000.

"Premises considered, plaintiff prays for citation in terms of the law, and on final hearing judgment for his damages and all costs, and will ever pray."

*Opinion.*—The request is made to this court to decide the perplexing and interesting questions whether the publications set out in the petition were a contempt of the court over which Judge Goodrich presided, or were simply libels upon his official character, for the redress of which he was solely relegated to a civil action in damages. This request is made upon the contention that the court did not have jurisdiction to punish the plaintiff for contempt, because the publications were not concerning a matter then pending officially before the court, but, upon the contrary, they related to the action of the court in a matter that had been finally determined and disposed of. It is not, and we suppose could not successfully be contended that the publications are true or that they

are not grossly libelous and serious reflections upon the integrity of the court. But whether they constituted a contempt of court is a question we are not required to decide, in view of the rulings we make upon other questions in the case. There is a conflict of authority upon this question. Some maintain that a publication reflecting upon the court or judge after the final disposition and conclusion of the proceeding to which it relates is not a contempt, but, if false, is a libel, for which the judge may have his action in damages. In re Pryor, 26 Am. Rep., 749; State v. Anderson, 40 Iowa, 207; Storey v. People, 79 Ill., 48; Cheadle v. State, 110 Ind., 309. Others hold that at common law a publication reflecting upon the court that may bring it into disrepute is a contempt, although the matters to which it relates may have ended and finally concluded. State v. Morrill, 16 Ark., 385; In re Chadwick, 67' N. W. Rep., 1076; State ex rel. Conner v. Stapleton, 23 Law. Rep. Ann., 787. At present we take no stand upon these diverse views, but will dispose of the case upon other grounds.

In the present state of the pleadings there are but two questions which we deem it necessary to decide. The first is whether a judge of the district court, when in the exercise of its general jurisdiction over the subjects of contempts and over the person of one who has been brought before him on such a charge, may be held liable in damages to the one it has punished when as a fact he was not guilty of the contempt ·or when the alleged contemptuous conduct was not in law a contempt of court. In other words, if such general jurisdiction of the court exists concerning the subject and person dealt with, may it, for exercising such jurisdiction, be held civilly liable for the errors it has committed, or may it be held liable for asserting its jurisdiction in a case where, by reason of its peculiar facts and the law as applied thereto, it should not have done so? The second question is: Did the Governor have the authority to pardon the plaintiff and remit the fine and imprisonment inflicted by the court, and if so, may the defendant be held civilly liable for the conduct alleged in aiding and assisting and advising in the further restraint of the plaintiff in his liberty after the grant of pardon?

In this connection it is well for us to explain what we understand to be the effect of the averments of the petition. The allegations to the effect that the defendant was an active agent in advising and preventing the sheriff from releasing the plaintiff by virtue of the pardon are sufficient in stating a cause of action against defendant, provided the Governor had the authority to extend the pardon. For these averments are to the effect that the conduct of the defendant in this particular was not that of a court, exercising its judicial functions, but was the act of the judge and that of the defendant as an individual; and if such was the case he would be held liable as anyone else who illegally participated in restraining another in his liberty. The remaining allegations are to the effect that the court did not have jurisdiction to punish the plaintiff for contempt, and that it exceeded its jurisdiction in this respect. There are statements, in this connection, to the effect that the court, in assum-

ing jurisdiction and inflicting the punishment, acted as a judge or an individual. These statements were evidently based upon the conclusion, previously asserted, that the court acted without jurisdiction, and we do not understand that it was the purpose to charge by these averments that the judge was not sitting as a court when the contempt proceedings were considered and disposed of. If the judge had heard and determined the matter of contempt and inflicted the punishment at a time when he was not acting as a court, a different case would have been presented, as the proceedings would have been coram non judice and void, for the statute confers the jurisdiction upon the court, and not upon the judge. With this construction of the averments of the petition, we will return to the questions to be disposed of in the order stated.

Article 1120, Sayles' Civil Statutes, which was in force when the contempt proceedings were heard and determined, is to the effect that the district courts may punish by fine not exceeding $100 and by imprisonment not exceding three days any person guilty of contempt of such courts. It was under this statute, it seems, that the court proceeded. There is no statute law which undertakes to define what is a contempt or under what circumstances the district court may exercise its jurisdiction in such matters. But it is well known that the district courts are courts of general jurisdiction over subjects under their control, and it must be admitted that the statute that confers jurisdiction upon these courts in contempt cases is as general in its terms and as broad in its scope as any other statute that confers jurisdiction upon these courts in other instances. Hence these courts, when acting in contempt proceedings, are in the exercise of their general jurisdiction over a subject confided by law to their cognizance, and when thus proceeding they are acting judicially in a like manner as if they were exercising their jurisdiction over any other subject or case confided to them by law. If the court is proceeding in inquiry of a subject of which it has jurisdiction, it must necessarily be clothed with the judicial discretion to ascertain and determine whether it should proceed and if it is proceeding in the right way, and if the facts and circumstances have arisen that authorize it to act and to proceed to judgment. The functions of the court when exercised in proceedings of this character are no less judicial than those exercised in other cases. Hence the law that relates to the liability and nonliability of courts when acting judicially applies when the acts complained of arise in a case like this, as they apply generally to all judicial acts done by a court when considering a subject within its general jurisdiction.

It is a doctrine well settled in this country that a judge, for the exercise of judicial discretion when sitting as a court over a subject within its jurisdiction, can not be held liable in damages by one claiming to be injured as the result of the official conduct. Rains v. Simpson, 50 Texas, 495; Bradley v. Fisher, 13 Wall., 344; Cooke v. Bangs, 31 Fed. Rep., 640; 7 Am. and Eng. Enc. of Law, 668; Mechem, Pub. Off., secs. 619-635. The reasons for this rule are generally well understood, and are stated in the authorities cited, and they need not be repeated by us. And

if the court is acting upon a subject within its jurisdiction, this immunity extends also to judicial conduct that may have been influenced by malicious or improper motives. If the court has jurisdiction of the subject and is proceeding judicially in order to reach a result, the legality of the final conclusion can in no manner be affected by the ulterior motives of the judge that influenced him in reaching that conclusion. The reasons that influenced him would have no bearing in determining whether his judicial conclusion was lawful or not. The question of motive is apart and distinct from the exercise of the judicial discretion of the court, for if judicial results were to be controlled by the motive that brought them about, and the exercise of judicial discretion was to be governed by the motive that influenced it, we would review and determine judgments, not upon the rules of law and equity that apply in such cases, but upon the personal feelings, animus, bias, and prejudice of the judge of the court whose judgment we were reviewing. Such a doctrine as this of course is unheard of. If the court in the case of contempt we are considering had jurisdiction, its judgment can not be impeached or inquired into because the judge may have been influenced by wrong motives in rendering it.

This whole question is so fully discussed by the Supreme Court of the United States in Bradley v. Fisher, supra, that we set out the views of that high court upon the subject:

"The plea, as will be seen from our statement of it, not only sets up that the order of which the plaintiff complains was an order of the criminal court, but that it was made by the defendant in the lawful exercise and performance of his authority and duty as its presiding justice. In other words, it sets up that the order for the entry of which the suit is brought was a judicial act, done by the defendant as the presiding justice of a court of general criminal jurisdiction. If such were the character of the act and the jurisdiction of the court, the defendant can not be subjected to responsibility for it in a civil action, however erroneous the act may have been and however injurious in its consequences it may have proved to the plaintiff. For it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself. Liability to answer everyone who might feel himself aggrieved by the action of the judge would be inconsistent with the possession of this freedom, and would destroy that independence without which no judiciary can be either respectable or useful. As observed by a distinguished English judge, it would establish the weakness of judicial authority in a degrading responsibility.

"The principle, therefore, which exempts judges of courts of superior or general authority from liability in a civil action for acts done by them in the exercise of their judicial functions, obtains in all countries where there is any well-ordered system of jurisprudence. It has been the settled doctrine of the English courts for many centuries, and has

never been denied, that we are aware of, in the courts of this country. It has, as Chancellor Kent observes, 'a deep root in the common law.'

"Nor can this exemption of the judges from civil liability be affected by the motives with which their judicial acts are performed. The purity of their motives can not in this way be the subject of judicial inquiry. This was adjudged in the case of Floyd and Barker, reported by Coke, in 1608, where it was laid down that the judges of the realm could not be drawn in question for any supposed corruption impeaching the verity of their records, except before the king himself, and it was observed that if they were required to answer otherwise, it would 'tend to the scandal and subversion of all justice, and those who are the most sincere would not be free from continual calumniations.'

"The truth of this latter observation is manifest to all persons having much experience with judicial proceedings in the superior courts. Controversies involving not merely great pecuniary interests, but the liberty and character of the parties, and consequently exciting the deepest feelings, are being constantly determined in those courts, in which there is great conflict in the evidence and great doubt as to the law which should govern their decision. It is this class of cases which impose upon the judge the severest labor, and often create in his mind a painful sense of responsibility. Yet it is precisely in this class of cases that the losing party feels most keenly the decision against him, and most readily accepts anything but the soundness of the decision in explanation of the action of the judge. Just in proportion to the strength of his convictions of the correctness of his own view of the case is he apt to complain of the judgment against him, and from complaints of the judgment to pass to the ascription of improper motives to the judge. When the controversy involves questions affecting large amounts of property or relates to a matter of general public concern, or touches the interests of numerous parties, the disappointment occasioned by an adverse decision often finds vent in imputations of this character, and from the imperfection of human nature this is hardly a subject of wonder. If civil actions could be maintained in such cases against the judge, because the losing party should see fit to allege in his complaint that the acts of the judge were done with partiality, or maliciously, or corruptly, the protection essential to judicial independence would be entirely swept away. Few persons sufficiently irritated to institute an action against a judge for his judicial acts would hesitate to ascribe any character to the acts which would be essential to the maintenance of the action.

"If upon such allegations a judge could be compelled to answer in a civil action for his judicial acts, not only would his office be degraded and his usefulness destroyed, but he would be subjected for his protection to the necessity of preserving a complete record of all the evidence produced before him in every litigated case, and of the authorities cited and arguments presented, in order that he might be able to show to the judge before whom he might be summoned by the losing party—and that judge perhaps one of an inferior jurisdiction—that he had decided as he did

with judicial integrity; and the second judge would be subjected to a similar burden, as he in his turn might also be held amenable by the losing party.

"Some just observations on this head by the late Chief Justice Shaw will be found in Pratt v. Gardner, and the point here was adjudged in the recent case of Fray v. Blackburn, by the Queen's Bench of England. One of the judges of that bench was sued for a judicial act, and on demurrer one of the objections taken to the declaration was, that it was bad in not alleging malice. Judgment on the demurrer having passed for the defendant, the plaintiff applied for leave to amend his declaration by introducing an allegation of malice and corruption; but Mr. Justice Compton replied: 'It is a principle of our law that no action will lie against a judge of one of the superior courts for a judicial act, though it be alleged to have been done maliciously and corruptly; therefore the proposed allegation would not make the declaration good. The public are deeply interested in this rule, which indeed exists for their benefit, and was established in order to secure the independence of the judges, and prevent them being harassed by vexatious actions;'—and the leave was refused.

"In this country the judges of the superior courts of record are only responsible to the people, or the authorities constituted by the people, from whom they receive their commissions, for the manner in which they discharge the great trusts of their office. If in the exercise of the powers with which they are clothed as ministers of justice, they act with partiality, or maliciously, or corruptly, or arbitrarily, or oppressively, they may be called to an account by impeachment and suspended or removed from office. In some States they may be thus suspended or removed without impeachment, by a vote of the two houses of the Legislature.

"In the case of Randall v. Brigham, decided by this court at the December term of 1868, we had occasion to consider at some length the liability of judicial officers to answer in a civil action for their judicial acts. In that case the plaintiff had been removed by the defendant, who was one of the justices of the Superior Court of Massachusetts, from the bar of that State, and the action was brought for such removal, which was alleged in the declaration to have been made without lawful authority, and wantonly, arbitrarily, and oppressively. In considering the questions presented the court observed that it was a general principle, applicable to all judicial officers, that they were not liable to a civil action for any judicial act done by them within their jurisdiction; that with reference to judges of limited and inferior authority it had been held that they were protected only when they acted within their jurisdiction; that if this were the case with respect to them, no such limitation existed with respect to judges of superior or general authority; that they were not liable in civil actions for their judicial acts, even when such acts were in excess of their jurisdiction, 'unless, perhaps, when the acts in excess of jurisdiction are done maliciously or corruptly.' The qualifying words were inserted upon the suggestion that the previous language

laid down the doctrine of judicial exemption from liability to civil actions in terms broader than was necessary for the case under consideration, and that if the language remained unqualified it would require an explanation of some apparently conflicting adjudications found in the reports. They were not intended as an expression of opinion that in the cases supposed such liability would exist, but to avoid the expression of a contrary doctrine.

"In the present case we have looked into the authorities and are clear, from them, as well as from the principle on which any exemption is maintained, that the qualifying words used were not necessary to a correct statement of the law, and that judges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly. A distinction must be here observed between excess of jurisdiction and the clear absence of all jurisdiction over the subject matter. Where there is clearly no jurisdiction over the subject matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. But where jurisdiction over the subject matter is invested by law in the judge, or in the court which he holds, the manner and extent in which the jurisdiction shall be exercised are generally as much questions for his determination as any other questions involved in the case, although upon the correctness of his determination in these particulars the validity of his judgment may depend. Thus, if a probate court, invested only with authority over wills and the settlement of estates of deceased persons, should proceed to try parties for public offenses, jurisdiction over the subject of offenses being entirely wanting in the court, and this being necessarily known to its judge, his commission would afford no protection to him in the exercise of the usurped authority. But if on the other hand a judge of a criminal court, invested with general criminal jurisdiction over offenses committed within a certain district, should hold a particular act to be a public offense, which is not by the law made an offense, and proceed to the arrest and trial of a party charged with such act, or should sentence a party convicted to a greater punishment than that authorized by the law upon its proper construction, no personal liability to civil action for such acts would attach to the judge, although those acts would be in excess of his jurisdiction, or of the jurisdiction of the court held by him, for these are particulars for his judicial consideration, whenever his general jurisdiction over the subject matter is invoked. Indeed some of the most difficult and embarrassing questions which a judicial officer is called upon to consider and determine relate to his jurisdiction, or that of the court held by him, or the manner in which the jurisdiction shall be exercised. And the same principle of exemption from liability which obtains for errors committed in the ordinary prosecution of a suit where there is jurisdiction of both subject and person, applies in cases of this kind, and for the same reasons.

"The distinction here made between acts done in excess of jurisdiction and acts where no jurisdiction whatever over the subject matter exists, was taken by the Court of King's Bench, in Ackerly v. Parkinson. In that case an action was brought against the vicar-general of the bishop of Chester and his surrogate, who held the consistorial and episcopal court of the bishop, for excommunicating the plaintiff with the greater excommunication for contumacy, in not taking upon himself the administration of an intestate's effects, to whom the plaintiff was next of kin, the citation issued to him being void, and having been so adjudged. The question presented was, whether under these circumstances the action would lie. The citation being void, the plaintiff had not been legally brought before the court, and the subsequent proceedings were set aside, on appeal, on that ground. Lord Ellenborough observed that it was his opinion that the action was not maintainable if the ecclesiastical court had a general jurisdiction over the subject matter, although the citation was a nullity, and said, that 'no authority had been cited to show that the judge would be liable to an action where he has jurisdiction, but has proceeded erroneously, or, as it is termed, inverso ordine.' Mr. Justice Blanc said there was 'a material distinction between a case where a party comes to an erroneous conclusion in a matter over which he has jurisdiction and a case where he acts wholly without jurisdiction;' and held that where the subject matter was within the jurisdiction of the judge, and the conclusion was erroneous, although the party should by reason of the error be entitled to have the conclusion set aside, and to be restored to his former rights, yet he was not entitled to claim compensation in damages for the injury done by such erroneous conclusion, as if the court had proceeded without any jurisdiction.

"The exemption of judges of the superior courts of record from liability to civil suit for their judicial acts existing when there is jurisdiction of the subject matter, though irregularity and error attend the exercise of the jurisdiction, the exemption can not be affected by any consideration of the motives with which the acts are done. The allegation of malicious or corrupt motives could always be made, and if the motives could be inquired into judges would be subjected to the same vexatious litigation upon such allegations, whether the motives had or had not any real existence. Against the consequences of their erroneous or irregular action, from whatever motives proceeding, the law has provided for private parties numerous remedies, and to those remedies they must, in such cases, resort. But for malice or corruption in their action whilst exercising their judicial functions within the general scope of their jurisdiction, the judges of these courts can only be reached by public prosecution in the form of impeachment, or in such other form as may be specially prescribed."

If the District Court of McLennan County had general jurisdiction over the subject of contempts—which we have seen to be the case—it follows that it may and should exert its judicial discretion in order to ascertain if it should exercise jurisdiction in the particular case and if

the conduct complained of is a contempt of its court and if the accused is the guilty agent. Its duty in this respect is no wise ministerial, and must in the nature of things be exercised judicially in order to reach a final result. And if in such cases in the exercise of its judicial functions it falls into error or reaches a conclusion not warranted by the facts and assumes to hold the accused guilty when he is in fact innocent, or erroneously holds, when applying the law, that the facts of that particular case constitute a contempt, these would be mistakes and errors of judgment that were committed by the court in investigating a subject confided to its general jurisdiction, for which it would not be liable. It can not be said of the court in this case that it did not have jurisdiction of the subject matter, but the most that may be said is that it committed an error in holding the accused guilty and erroneously held the doubtful question that the publication was a contempt under the law. If the judge in this instance could be held liable for failing to correctly construe the facts and apply the law, he may be held liable in any case where he is proceeding about a subject matter within the jurisdiction of his court when he may erroneously hold a defendant guilty, and as a result deprive him of his liberty. For instance, the district courts have general jurisdiction in cases of theft. Now, the court, in a trial of such a case, may commit an error which might result in an innocent man being punished and deprived of his liberty. In such a case the law and the profession well understand that the judge can not be held civilly liable, for the error and mistake were committed when in the exercise of judicial functions over a subject within the jurisdiction of his court. This is well illustrated by the reasoning of the court in Bradley v. Fisher, supra.

The more difficult question in the case is the second one, which relates to the authority of the Governor to extend pardons in cases of contempt. In justice to the Governor who issued the pardon for the relief of the plaintiff it should be said that there is respectable authority for his course in that matter, and that there is a difference of opinion among eminent members of the legal profession in this State as to whether the executive may pardon in contempt cases. The cases of Ex parte Hickey, 4 Smedes & Marshall (Mississippi), 783, and State of Louisiana ex rel. Van Orden v. Sauvinett, 24 Louisiana, 119, are the two most notable cases called to the attention of the court which support the authority of the Governor to grant pardons in such cases. The principal reasons upon which these cases rest are that those courts construe a contempt as a criminal case, and therefore it is embraced in the category of crimes which may be pardoned. The correctness of the ruling in the Mississippi case can be rested upon the peculiar language of the Constitution of that State upon the subject. It authorizes the Governor to grant pardons and remit fines in all criminal and penal cases, except treason and impeachment. The term "penal cases" may possibly be held to embrace contempts. But the Louisiana case is based upon the sole proposition that a contempt is a crime against the State, and the case is

therefore criminal. The court in that case, in persuading itself to the view that a contempt is a criminal case, resorts to argument that is clearly fallacious. It is there contended that it is essential that the pardoning power should exist in such cases, because it is necessary that the Governor, as the balance of power, should have the authority to hold in check the abuses of the courts in the exercise of tyrannical and despotic authority in the performance of their judicial functions. It is possible, as indicated from the history of Louisiana at the time the decision in that case was rendered, that there was a necessity for such a rule in that State, and that the danger to the citizen from the tyranny and usurpation of the courts may have been more real than fancied; but it is extremely doubtful if such conditions ever existed or will ever exist in any other of the States of the American Union where it may be necessary to clothe the executive of the State with authority to correct and control abuses by the courts. In this enlightened age the conservatism of the judicial departments of governments is usually recognized and relied upon in all civilized nations as the power to which is properly confided the rights of property and life and liberty of the citizen. And it is a novel argument that there exists a prerogative in another department of the government—not by virtue of express law, but by reason of the apprehension that the courts will abuse their authority— to substitute its opinion for that of the courts and to assume judicial functions which do not belong to it and inquire into the legality of a conviction and whether the judge acted properly and with due regard to the rights of the defendant in the trial of the case. If such authority is granted by the Constitution it may be exercised, but if not, the danger feared by the Louisiana court would be no justification for executive interference, and in such a case the usurpation would come from him, and not the court. The Governor is not the representative of sovereignty, nor has he any supervisory control over the courts by virtue of his office, and his functions, like those of the courts, can only be found in the written law that defines his authority.

We will not concern ourselves further about the reasons given in the Louisiana case and in other cases why the Governor may extend pardons in cases of contempt, as we will look to our own Constitution for his authority in such matters.

It is a familiar rule of construction in this State that when the Constitution defines the powers of an officer he is confined to the powers enumerated, and the express mention of such powers negatives the existence of others. The Constitution of this State declares that in all criminal cases, except treason and impeachment, the Governor shall have power, after conviction, to grant reprieves, commutations of punishment and pardons, and under such rules as the Legislature may provide he shall have power to remit fines and forfeitures. The Legislature, as provided in the Code of Criminal Procedure, has authorized him to remit fines and grant pardons in criminal actions. The real inquiry is whether

a contempt proceeding is a criminal case, within the meaning of this constitutional provision.

If the words "criminal case" are confined to the crimes mentioned in the penal code and should be held to be construed only as the term crime and offense is therein defined, there would be little difficulty in reaching a correct conclusion upon this question, for the question of contempt is not mentioned in the penal code and is not there characterized as a crime or offense.

When we inquire into the reason of the law that confers the power upon the courts to punish for contempts we can not well perceive that the Constitution, in authorizing the executive to pardon crimes and remit fines in criminal cases intended that the power should be exercised in contempt cases and that such cases should be regarded as criminal. The efficiency and integrity of courts demand that they shall have the right, in order to transact their business in an orderly way, to require the observance of decorum and to punish those who may interfere with them when exercising their judicial functions or who may at such times by willful conduct interfere with the peace of the court or bring it into contempt. If the power is given to the Governor to pardon in cases of this character, it admits the weakness and want of the power in the court to preserve its standing and to protect itself from contempts, and would virtually lodge in the Governor the final power to determine if a contempt has been shown to the court and whether the party should be punished. Such a concession of authority is incompatible with many provisions of law on the subject of contempt. How could a court preserve the ends of justice by compelling an unwilling witness to testify if the Governor could relieve him from the punishment inflicted by the court for his refusal? How may a court enforce its orders in injunction and mandamus and in other proceedings if a Governor may virtually set them aside by pardoning the one who has willfully disobeyed them? How may obedience to the process of the court be enforced if a Governor may stand between the court and the one that has disobeyed it? How may a court in an orderly and efficient way perform its official functions and public duties if a Governor may paralyze its power in furtherance of these ends? The moment you admit that a Governor has the power to cripple a court in the performance of its duties in the way noticed, then it virtually follows as a sequence that the courts in the administration of justice are under the control of the Governor, and while he can not influence their judicial acts and conduct, he may control it. It is not believed that the Constitution of this State intended to invest him with any such power. And it is believed, as before said, that the term "criminal cases," as there used, was intended to be understood as meaning those cases and crimes provided for in the criminal code, for which a conviction must be had in the manner provided by law for the trial of criminal cases. The Constitution, as well as the law in all criminal cases, gives to the defendant the right of trial by jury, but it has never in this State been held that a defendant charged with contempt was entitled to a jury, except,

possibly, in proceeding against an attorney at law when charged with a contempt involving fraudulent or dishonorable conduct or malpractice. But, upon the contrary, it has been expressly decided that in contempts, except where the statute directs otherwise, there is no trial by jury allowed. Crow v. State, 24 Texas, 12. And it is also held in Casey v. State, 25 Texas, 384, that a contempt is not such a criminal case as may be appealed. And to the same effect is the State v. Thurmond, 37 Texas, 340. In Scott v. State, 86 Texas, 321, in a well considered opinion by the present Chief Justice of the Supreme Court, it was held that a proceeding to disbar an attorney was not a criminal case; and it is there said, quoting from Abbott's Law Dictionary, that a criminal case is defined to be "an action, suit or cause instituted to secure conviction and punishment for crime." Black, in his Law Dictionary, 302, defines a criminal case to be an action, suit, or cause instituted to punish an infraction of the criminal law.

The court in the Scott case, 86 Texas, 321, in determining that a disbarment proceeding is not a criminal case, lays much stress, and properly so, upon the fact that on the subject of crimes our code of criminal laws is supposed to be complete, and that no act is regarded in this State as a crime unless it is so declared by statute law and fully defined; and as the criminal code was silent upon the question of disbarment, and the proceedings that regulated it were only found in the civil code, that the conclusion should be reached that it was not a criminal case, and therefore the Court of Civil Appeals had jurisdiction of it on error.

If the court in that case properly held, which was doubtless the case, that a disbarment proceeding was not a criminal case, for a like reason it should be held that a contempt is not a criminal case; for no where in the criminal code is the subject mentioned, but all there is that relates thereto is found in the civil statutes. Further, a proceeding to disbar an attorney and remove him from his office is as much a matter of public interest as a proceeding in contempt, and the dishonorable conduct and malfeasance in office for which he may be punished by being stricken from the roll is as much an offense against the public as would be a contempt of court. The punishment inflicted upon the attorney by removal from office is in a sense penal in character, and he is made to suffer this penalty as a punishment for the wrong he has done the public; and that public has the same direct interest in his punishment and receives the same benefit thereby, in contemplation of law, as would be the case of one punished for contempt.

If the Supreme Court in the cases of Crow v. State, 24 Texas, and Casey v. State, 25 Texas, supra, had regarded contempts as criminal cases under the law in this State, they would not have denied in the one case the right of appeal, and in the other the right of trial by jury; for the law, in granting the right of appeal and trial by jury, applies alike to all criminal cases. Hence these decisions, in our opinion, are direct authority against the proposition that proceedings in contempts are criminal cases, as that term is understood and meant by the laws of this State.

The Supreme Court of Michigan, In re Chadwick, 67 Northwestern Reporter, 1074, also holds that proceedings in contempt are not criminal cases.

There is also another reason which is simply persuasive that may be advanced why contempts in this State are not regarded as criminal cases. The practice is universal in the courts of this State to exercise, when they so desire, the discretion to remit the punishment inflicted by them in such cases. If contempts were such criminal cases, within the meaning of the Constitution, that the Governor could pardon, the discretion so often and frequently exercised by the courts in remitting the punishment in such cases would be unauthorized, for they have no power to remit fines in criminal cases or grant pardons, for the jurisdiction of the Governor in these matters is exclusive. It can not be believed that this authority, which has so long been exercised and recognized, would have passed to this time unchallenged if it had been by the courts and the law regarded as unwarranted. The vigilance of the counties and the law officers who are interested in fines imposed in such cases would have questioned the authority of the courts to remit, if it had been believed that contempts were criminal cases, within the meaning of the law. Attention is only called to this aspect of the question as having some bearing in interpreting the term "criminal cases," as used in the constitutional provision relating to pardons, as it shows the uniform construction placed upon the statutes punishing contempts by the courts and the officers charged with its execution.

We extend the discussion of the questions passed upon no further, and hold that as the District Court had jurisdiction of the matter of contempt, although it may have exercised it to an erroneous conclusion, the judge was not liable, and also hold that the Governor did not have the authority to extend the pardon in this instance, and for these reasons the demurrer was properly sustained.

*Affirmed.*