## UNITED STATES v. GROSSMAN.

(District Court, N. D. Illinois, E. D. May 15, 1924.)

**1. Contempt ⬥30—Court has inherent power to punish for contempt.**

A court has inherent power to punish for contempt.

**2. Common law ⬥13—There is no federal common law.**

There is no federal common law.

**3. Criminal law ⬥9—Only offenses against United States are those declared by Congress.**

There are no offenses against the United States save those declared to be such by Congress.

**4. Pardon ⬥3—President not empowered to pardon one found guilty of criminal contempt; "offenses against United States."**

Const. art. 2, § 2, subd. 1, empowering the President to grant pardons for "offenses against the United States," does not authorize the President to pardon one who has been found guilty of criminal contempt, since contempt of court is not made an "offense" by statute.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Offense against the United States.]

**5. Constitutional law ⬥79 — President's assumption of power to pardon one adjudged in contempt held usurpation of authority.**

President's assumption of power to pardon one who has been adjudged in contempt of court by federal court established under Const. art. 3, § 1, is usurpation of authority, under constitutional provisions separating judiciary and executive departments.

**6. Contempt ⬥66(7)—Commitment not reviewable on appeal, except on question of jurisdiction.**

Contempt commitment is not reviewable on appeal, except on the question of jurisdiction.

On a bill filed by the government, acting by the Attorney General of Illinois, an order was entered by this court restraining the defendant temporarily from maintaining a liquor nuisance as defined in the National Prohibition Law.   Thereafter an information was filed, charging the defendant that, after the temporary restraining order had been served upon him, he and his agents had sold whisky to divers and sundry persons, and praying for a citation directing the defendant to appear and show cause why he should not be punished for contempt of court.   Upon this information a bench warrant issued, and the defendant was brought into court.

After a hearing, at which evidence was heard upon both sides, this court, on February 7, 1921, entered an order finding the defendant guilty of contempt of court for violating the injunctional order, and ordered him committed to the House of Correction for one year and to pay a fine of $1,000. This order was afterwards affirmed by the Circuit Court of Appeals for the Seventh Circuit.   Grossman v. United States, 280 Fed. 683.

On August 21, 1922, the defendant moved to set aside the sentence and for a rehearing.   On December 27, 1922, the motion was denied, and an order of commitment was issued.   On January 3, 1924, the defendant filed a petition and on January 8, 1924, an amended petition, for the purpose of having the original order modified by eliminating the jail sentence, and on the hearing of that petition, on January 11, 1924, there was offered in evidence in his behalf a pardon from the President of the United States granted on December 28, 1923, forgiving the jail sentence.

Louis J. Behan and Robert A. Milroy, both of Chicago, Ill., for petitioner.

Before CARPENTER and WILKERSON, District Judges.

CARPENTER, District Judge (after stating the facts as above).   The question before us for decision is whether the President of the United States of America is invested with the power to relieve parties punished for contempt by judges of the federal court.   The precise question has never been passed upon by the Supreme Court of the United States, and there is no decision of an inferior federal court which is entitled to present authority.   It will be necessary, therefore, to base this opinion upon an interpretation of the Constitution read in the light of the fundamental principles of American constitutional government.

The President derives his pardoning power from article 2, § 2, subd. 1, of the Constitution, which provides: "The President * * * shall have power to grant reprieves and pardons for offenses against the United States, except in cases of impeachment."

The power of the judiciary is defined in article 3, § 1: "The judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as Congress may from time to time ordain and establish."

To determine whether or not a contempt of court is a public offense, it may be well to look at the background of our institutions, and to emphasize some of the basic canons of construction which necessarily must guide the courts to an intelligent and proper constitutional interpretation. Our Constitution fortunately is still a vital instrument.   Simply regarded, it is an exposition of our scheme of government.   It gives life, providing only it receives wise and understanding treatment.   The courts, through their power of interpretation, can continue its vitality or contribute materially towards its destruction.

"A Constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and could scarcely be embraced by the human mind.   It would probably never be understood by the public.   Its nature, therefore, requires that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of the objects themselves. That this idea was entertained by the framers of the American Constitution, is not only to be inferred from the nature of the instrument, but from the language. * * * In considering this question, then, we must never forget that it is a constitution we are expounding."   Chief Justice Marshall, in McCulloch v. Maryland, 4 Wheat. 316, at page 407 (4 L. Ed. 579).

The same thought was expressed by Mr. Justice Gray in the Legal Tender Case, Juilliard v. Greenman, 110 U. S. 421, at page 439, 4 S. Ct. 122, 125 (28 L. Ed. 204): "A Constitution, establishing a frame of

government, declaring fundamental principles, and creating a national sovereignty, and intended to endure for ages and to be adapted to the various crises of human affairs, is not to be interpreted with the strictness of a private contract."

Chief Justice Fuller said, in Pollock v. Farmers' Loan & Trust Company, 157 U. S. 429, 15 S. Ct. 673, 39 L. Ed. 759: "Nevertheless it may be admitted that, although this definition of direct taxes is prima facie correct, and to be applied in the consideration of the question before us, yet that the Constitution may bear a different meaning, and that such different meaning must be recognized. But, in arriving at any conclusion upon this point, we are at liberty to refer to the historical circumstances attending the framing and adoption of the Constitution as well as the entire frame and scheme of the instrument, and the consequences naturally attendant upon the one construction or the other."

Mr. Justice Miller, speaking for the Supreme Court in Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377, sounded a warning against the danger of encroachment by one department upon another: "In the main, however, that instrument, the model on which are constructed the fundamental laws of the states, has blocked out with singular precision and in bold lines, in its three primary articles, the allotment of power to the executive, the legislative, and the judicial departments of the government. It also remains true, as a general rule, that the powers confided by the Constitution to one of these departments cannot be exercised by another. It may be said that these are truisms which need no repetition here to give them force. But while the experience of almost a century has in general shown a wise and commendable forbearance in each of these branches from encroachments upon the others, it is not to be denied that such attempts have been made, and it is believed not always without success. The increase in the number of states, in their population and wealth, and in the amount of power, if not in its nature to be exercised by the federal government, presents powerful and growing temptations to those to whom that exercise is intrusted, to overstep the just boundaries of their own department, and enter upon the domain of one of the others, or to assume powers not intrusted to either of them."

Mr. Madison, afterwards President of the United States, said: "It is laid down in most of the Constitutions or Bills of Rights in the republics of America; it is to be found in the political writings of the celebrated civilians, and it is everywhere held as essential to the preservation of liberty that the three great departments of government be kept separate and distinct."

[1] With these principles in mind this court now has to decide whether the executive has the power to pardon offenders against judicial authority. Is the judicial power of the government dependent upon the good will of the executive? It is universally agreed that the power to punish for contempt is inherent in every court of justice. The moment a court is created, that court possesses the power to command respect. U. S. v. Hudson, 7 Cranch, 32, 3 L. Ed. 259; Ex parte Wall, 107 U. S. 265, 2 S. Ct. 569, 27 L. Ed. 552; Ex parte Terry, 128 U. S. 289, 9 S. Ct. 77, 32 L. Ed. 405.

In Gompers v. Buck's Stove & Range Co., 221 U. S. 418, at page 450, 31 S. Ct. 492, 551 (55 L. Ed. 797, 34 L. R. A. [N. S.] 874), the court said: "For, while it is sparingly to be used, yet the power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it they are mere boards of arbitration, whose judgments and decrees would be only advisory."

Congress may, from time to time under the Constitution, limit the jurisdiction of the inferior courts and regulate their procedure; but as Judge Baker said, in Michaelson v. United States (C. C. A.) 291 Fed. 940, at page 946: "Viewing the inferior courts, and also the Supreme Court as an appellate tribunal, we see that Congress, the agency to exercise the legislative power of the United States, can, as a potter, shape the vessel of jurisdiction, the capacity to receive; but, the vessel having been made, the judicial power of the United States is poured into the vessel, large or small, not by Congress, but by the Constitution."

It did not need an act of Congress to give to the federal courts power to enforce their decrees. "The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice. The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became pos-

sessed of this power." Mr. Justice Field, in Ex parte Robinson, 19 Wall. at page 510, 22 L. Ed. 205.

In Arnold v. Commonwealth, 80 Ky. 200, 44 Am. Rep. 480, it was held that the Legislature might restrict the punishment and prescribe the form of procedure, but that it could not destroy the inherent power of a court to punish for contempt. The inquiry as to the power of the President to pardon persons sentenced for contempt of a federal court resolves itself into the question of determining whether or not a contempt falls within the category of "offenses against the United States."

The nature of contempt, as civil or criminal, usually has been the essential factor in deciding whether or not the executive may pardon. Generally stated, the prevailing opinion is that the power to pardon exists in cases of criminal contempt, but not in cases of civil contempt.

The Court of Appeals of the Seventh Circuit has decided in Pino v. United States, 278 Fed. 479, that a judgment of contempt, imposing a fine and imprisonment for a definite term for violation of an injunction granted under National Prohibition Act, tit. 2, § 22 (Comp. St. Ann. Supp. 1923, § 10138½k), restraining the maintenance of a common nuisance, is criminal in its nature and abates upon the death of the defendant. It is unnecessary, therefore, for this court to go further. We must assume that Grossman's contempt was criminal as distinguished from civil.

The historical distinction between civil and criminal contempts may well be considered, in order to gain a better understanding of the exact problem here for decision. When a member of Parliament refused to respond to an order in favor of a private party, his parliamentary privilege protected him against imprisonment until such a time as he should render satisfaction to the other party. Walker v. Earl of Grosvenor, 7 T. R. 171 (1797); Catmur v. Sir Knatchbrill, 7 T. R. 448 (1797). Peers, accordingly, were enabled to flout the authority of the courts. To counteract this, and to save its dignity, the judiciary soon held that a contempt directed against the court itself should be considered a criminal contempt, and that parliamentary privilege would not prevail. Wellesley's Case, 2 Russ. & U. 639 (1831); In re Freston, L. R. 11 Q. B. D. 545 (1883). The distinction was gradually and consequently developed, becoming a fixed rule in the law of contempt. In re Gent, 40 Ch. D. 190 (1880); O'Shea v. O'Shea, 15 P. D.

59 (1890); Seaward v. Paterson, 1 Ch. 545 (1897).

Irrespective of the logic involved, the distinction is at least convenient. Almost universally the definition of a criminal contempt is an act or refusal to act which by detracting from the dignity or authority of a court tends to interfere with the administration of justice. A refusal to do justice to other litigants in equity is generally recognized as a civil contempt. Some difficulty has arisen because of this distinction. There are cases where the line of demarcation between civil and criminal contempts, as legally defined, is almost imaginary, certainly nebulous. Confusion is natural from the nature of the problem, because it involves a question of degree. Every contempt is directed at the authority of the court which issued the order, just as every contempt is calculated in some way to prejudice one of the parties to the litigation. Thus the courts and text-writers are divided on the question whether the corrective order is punitive, as in the case of criminal contempt, or remedial and coercive, as in the case of civil contempt.

Professor Beale, in an article on Contempt of Court, Civil and Criminal, in 21 Harvard Law Review, 161 (1908) says: "It sometimes happened, however, that a person violated a decree in such a way that it was impossible for him to restore the status quo ante. In such a case if the other party to the suit were obdurate he might remain in prison during the rest of his natural life, through his inability to purge himself of his contempt. This was obviously a hardship and an injustice and a limited term of imprisonment came to be looked upon as a requirement of humanity. It was probably for this reason that in recent times a sort of punishment by limited term of imprisonment, or even by time, payable to the injured party, has been substituted for the old coercive imprisonment in case of civil contempt." The Illinois decisions uphold this view. Leopold v. People, 140 Ill. 552, 30 N. E. 348 (1892); Swedish-American Tel. Co. v. Fidelity Co., 208 Ill. 562, 70 N. E. 768 (1904); Rothschild & Co. v. Steger & Sons Co., 256 Ill. 196, 99 N. E. 920, 42 L. R. A. (N. S.) 793, Ann. Cas. 1913E, 276 (1912); People v. Peters, 305 Ill. 223, 137 N. E. 118, 26 A. L. R. 16 (1922).

Mr. Justice Lamar stated, in Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874 (1910):

"Contempts are neither wholly civil nor

altogether criminal. And 'it may not always be easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both.' [Citations.] But in either event, and whether the proceedings be civil or criminal, there must be an allegation that in contempt of court the defendant has disobeyed the order, and a prayer that he be attached and punished therefor. It is not the fact of punishment, but rather its character and purpose, that often serve to distinguish between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court. It is true that punishment by imprisonment may be remedial, as well as punitive, and many civil contempt proceedings have resulted not only in the imposition of a fine, payable to the complainant, but also in committing the defendant to prison. But imprisonment for civil contempt is ordered where the defendant has refused to do an affirmative act required by the provisions of an order which, either in form or substance, was mandatory in its character. Imprisonment in such cases is not inflicted as a punishment, but is intended to be remedial by coercing the defendant to do what he had refused to do. The decree in such cases is that the defendant stand committed unless and until he performs the affirmative act required by the court's order.

"For example: If a defendant should refuse to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance required by a decree for specific performance, he could be committed until he complied with the order. Unless these were special elements of contumacy, the refusal to pay or to comply with the order is treated as being rather in resistance to the opposite party than in contempt of the court. The order for imprisonment in this class of cases, therefore, is not to vindicate the authority of the law, but is remedial, and is intended to coerce the defendant to do the thing required by the order for the benefit of the complainant. If imprisoned, as aptly said in Re Nevitt, 54 C. C. A. 622, 117 Fed. 451, 'he carries the keys of his prison in his own pocket.' He can end the sentence and discharge himself at any moment by doing what he had previously refused to do.

"On the other hand, if the defendant does that which he has been commanded not to do, the disobedience is a thing accomplished.

1 F.(2d)—60

Imprisonment cannot undo or remedy what has been done, nor afford any compensation for the pecuniary injury caused by the disobedience. If the sentence is limited to imprisonment for a definite period, the defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense. Such imprisonment operates, not as a remedy coercive in its nature, but solely as punishment for the completed act of disobedience. It is true that either form of imprisonment has also an incidental effect. For if the case is civil and the punishment is purely remedial, there is also a vindication of the court's authority. On the other hand, if the proceeding is for criminal contempt and the imprisonment is solely punitive, to vindicate the authority of the law, the complainant may also derive some incidental benefit from the fact that such punishment tends to prevent a repetition of the disobedience. But such indirect consequences will not change imprisonment which is merely coercive and remedial, into that which is solely punitive in character, or vice versa. * * * The distinction between refusing to do an act commanded (remedied by imprisonment until the party performs the required act) and doing an act forbidden (punished by imprisonment for a definite term) is sound in principle, and generally, if not universally, affords a test by which to determine the character of the punishment."

On the question before us, the power of the President to pardon persons punished for a so-called criminal contempt, there is a division not of authority but of opinion. It has been held in Tennessee, Louisiana, and Mississippi that the executive has the pardoning power in such cases. Texas has held to the contrary.

In Sharp v. State ex rel. Carson, 102 Tenn. 9, 49 S. W. 752, 43 L. R. A. 788, 73 Am. St. Rep. 851 (1899), the court held that a judgment imposing a fine for contempt is a conviction, therefore contempt is a public offense and consequently within the pardoning power. The court approached its decision through a literal construction of an isolated clause in the state Constitution, without even discussing the broad question involved.

In Ex parte Hickey, 4 Smedes & M. (Miss.) 751 (1845), the petitioner published an article accusing a judge of abetting one on trial before him for murder. He was fined $500 and sentenced to five months in prison for contempt, in the face of a statute fixing the maximum punishment at $100

or imprisonment during the term of court where the contempt was in the presence of the court. Upon receiving a pardon from the Governor, the sheriff released him, but he was recommitted on a bench warrant. He was released upon a writ of habeas corpus upon the ground that this was not contempt of court, but a libel on the functionary, and also upon the ground that the Governor had the power to pardon for contempt because it was a public offense. As the writ of habeas corpus challenges the jurisdiction of the committing tribunal, it was sufficient to decide that it was not contempt of court. However, it is significant to note that the Mississippi Constitution gave the Governor power to pardon in criminal *and penal* matters.

In State ex rel. Van Orden v. Sauvinet, 24 La. Ann. 119, 13 Am. Rep. 115 (1872), the relator disobeyed an order of sequestration and was sentenced to ten days in prison for contempt. The Governor had pardoned him, and the court held that the executive had the power because contempt was a public offense and not against the judge personally, and because this right to pardon was a necessary check upon the judicial power. The court placed great reliance upon the opinions of various of the Attorneys General of the United States. In connection with this case it may be admitted that a contempt is not against the judge personally, but it does not follow that it is a "public offense."

The President of the United States has been advised from time to time that he had the power to pardon persons punished for contempt of court by Attorney General Gilpin, 3 Op. Attys. Gen. 622 (1841); Attorney General Mason, 4 Op. Attys. Gen. 458 (1845); Attorney General Crittenden, 5 Op. Attys. Gen. 579 (1852); Attorney General Daugherty, in Craig Case (1924), unreported.

The only case where the instant question was directly involved, and decided against the executive action, is Taylor v. Goodrich, 25 Tex. Civ. App. 109. There the plaintiff published an article concerning the defendant, a judge, reflecting upon his integrity in making a decision. He was committed to jail for contempt but pardoned by the Governor. The sheriff refused to release him, and after appropriate action the court held that it was a criminal contempt of court and that the Governor had no right of pardon, assigning as its reasons that the sentencing court had the exclusive power to remit or change its orders; that the executive had no

prerogative to substitute its opinion for that of the courts solely because of an apprehension that judicial power might be abused; that the Governor is not the representative of the sovereignty, as was the British king.

Two other cases discuss the problem here involved very lucidly, and it seems to us conclusively, although by way of dictum. In re Nevitt, 117 F. 448, 54 C. C. A. 622 (1902); State ex rel. Rodd v. Verage, 177 Wis. 295, 187 N. W. 830, 23 A. L. R. 491 (1922). Judge Sanborn, delivering the opinion for the Court of Appeals for the Eighth Circuit in the Nevitt Case, said:

"The contention of counsel for the petitioners and the authorities to which he calls our attention suggest a very interesting question, the answer to which is not essential to the decision of this application—the question whether or not the President has the power to pardon those committed or fined for criminal contempts; those fined or imprisoned to vindicate the dignity and to preserve the power of the court, or to punish the disobedience of its direction, as distinguished from those fined and imprisoned for civil contempts, as in the case before us; those fined or imprisoned for the purpose of protecting or enforcing the private rights and remedies of parties to civil suits. If the President has the power to pardon those who are committed for criminal contempts of the authority of the courts, and thus to relieve them from fines or imprisonments inflicted to punish them for their disobedience, this immemorial attribute of judicial power is thus practically withdrawn from the courts and transferred to the executive; for he may pardon whom he will, and he would have the power to so exercise this authority as to deprive the courts of all means to punish for disobedience of their orders. Is there any provision of the Constitution of the United States which grants this inherent and essential attribute of judicial power, or the authority to control its exercise, to the executive? Congress has undoubted authority to punish recalcitrant witnesses for contempt of its authority. The offenses of such witnesses are as much offenses against the United States as the offenses of witnesses, jurors, or parties who disobey the orders, writs or processes of the courts. May the President pardon such witnesses who are committed for the purpose of punishing them for the disobedience of such orders and processes, and thus deprive Congress and the courts of the ability to punish for disobedience of their lawful orders and processes? If a court fines or

imprisons a juror because he refused to obey its mandate when summoned, or because he refuses to act when he appears, may the President immediately pardon him, and thus relieve him from all punishment for disobedience of the order of the court? May he pardon all jurors for all disobedience of the mandates of the courts, and thus practically deprive the courts of the power to summon jurors? If riotous persons are fined or imprisoned for disturbing, defying, and preventing the proceedings of a court, may the President pardon them, and thus deprive the court of the power to continue its sessions and to discharge its functions? In other words, has the executive the power, if he chooses to exercise it, of drawing to himself all the real judicial power of the nation which the Constitution vested in express terms in the courts, by means of his supreme control of the inherent and essential attribute of that power—the authority to punish for disobedience of the orders of the courts? These questions seem to suggest their answers. * * * But these opinions [Attorneys General Gilpin and Mason] are neither controlling nor persuasive, because they contain no discussion and give no consideration to the controlling fact which must in the end condition and determine the decision of these questions, the fact that the judicial power of the United States is not derived from the king, as it was in England, or from the President, but is granted by the people by means of the Constitution, in its entirety, including the inherent and indispensable attribute of that power, the authority to punish for disobedience of their orders, to the federal courts, free from the control or supervision of the executive department of the government, to the same extent that the entire executive power of the nation is vested in the President, free from the supervision or control of the courts."

The opinion of the majority of the court in the Verage Case, supra, gives such an exhaustive consideration of the matter under discussion, that we feel justified in quoting at considerable length:

"This disposes of the case without reaching the question whether the Governor has power to pardon in criminal contempt cases; that is, where the punishment is inflicted for purely punitive purposes and to expiate the contemnor's public offense. This is a very interesting question, and one to which we have devoted no little thought and consideration. It may be said to be an unsettled question in this country, as instances of its

judicial consideration are rare. It has been held in three states that the power to pardon in such cases rests with the Governor. State ex rel. W. Van Orden v. Sauvinet, 24 La. Ann. 119, 13 Am. Rep. 115; Sharp v. State, 102 Tenn. 9, 49 S. W. 752, 43 L. R. A. 788, 73 Am. St. Rep. 851; Ex parte Hickey, 4 Smedes & M. (Miss.) 751. On the other hand, the power has been denied by the Court of Civil Appeals of Texas. Taylor v. Goodrich, 25 Tex. Civ. App. 124, 40 S. W. 515. Although the question of the power of the President to pardon in criminal contempt cases was not involved, the subject was lucidly discussed in the case of In re Nevitt, 117 Fed. 448, 54 C. C. A. 622. The logic of the discussion resulted in a denial of the power of the President to pardon in such cases. While the question has never been before the federal Supreme Court, the power has been exercised from time to time by the various Presidents of the United States, pursuant to a practice evidently founded upon early opinions of Attorneys General of the United States. Ops. U. S. Attys. Gen. vol. 3, p. 622; Id. vol. 4, pp. 317, 458. While we are not disposed to decide the question, as it is not necessary here, in view of the fact that it may be considered as an open question in this country, we are constrained to call attention to certain phases thereof which it seems to us cannot be ignored in arriving at a sound and correct conclusion, considerations which evidently did not occur to the courts holding that the executive had the power to pardon in such cases.

"As we interpret the decisions of the Mississippi, Louisiana, and Tennessee courts, they rested their conclusions upon the ground that the power of the Governor to pardon was similar in its scope to that of the King of England, and that the power of the Governor to pardon in contempt cases was comparable to that of the king, on the theory that the common law is in force in this country. It also seems to us that undue significance was attached to certain language used by Chief Justice Marshall in the case of U. S. v. Wilson, 7 Pet. 150, at page 160, 8 L. Ed. 640, as supporting the conclusion that the pardoning power of the king, in its full scope and extent, is under our Constitutions reposed in the executive departments of government. Speaking of the pardoning power in that case, Chief Justice Marshall said: 'As this power has been exercised, from time immemorial, by the executive of that nation whose language is our language, and to whose judicial institutions

ours bear a close resemblance, we adopt their principles respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who would avail himself of it.'

"It is to be noted that this language was used concerning the 'operation and effect' of a pardon granted in pursuance of the unquestionable power of the President of the United States. The question of the extent of the power was not involved in the case at all, and it does not seem to us that the expression there used has any bearing upon the question we are considering. It is well to remember that, while the common law of England is in force in this country, it is in force only so far as it is compatible with our views of liberty and sovereignty. In all matters touching the affairs of government and the liberty of the citizen, we are apt to go astray if we proceed upon the assumption that as to such matters we are governed by the principles of the common law, for the reason that our fundamental notions of the rights of the individual, of the liberty of the citizen, and of the repository of sovereign power, do not conform to the spirit in which the principles of the common law were generated and developed. This finds graphic illustration in Nunnemacher v. State, 129 Wis. 190, 108 N. W. 627, 9 L. R. A. (N. S.) 121, 9 Ann. Cas. 711, where this court held, in the face of universal precedent to the contrary, that the right to transfer property from the dead to the living was a natural right and not a privilege.

"In this country all sovereign power is lodged in the people. They have established governments, and to these governments they have delegated such portions of the sovereign power as they have not retained unto themselves. That government is represented by three great, independent, co-ordinate departments, the executive, the legislature and the judiciary. Each department is supreme in its field. Each department is independent of the others. No one of these departments may encroach upon the prerogatives of the others. It is the function of the judiciary to declare and enforce private and public rights. The power to punish for contempt is an inherent and necessary power to enforce its orders and decrees, to preserve order, to compel the attendance of witnesses and jurors and, in general, to enable it to perform the functions for which it was created. It is a not reckless statement to say that universal public opinion every-

where holds that the judiciary more than any other department of government should be immune from any outside influence or interference. Now is it possible that the people intended that the executive should possess a veto over the exercise of the power vested in the courts to punish for a contempt and disobedience of their lawful orders? Is not such a power repugnant to the entire governmental scheme of our Constitution? Is it not destructive of a power of the judiciary essential to enable it to perform its functions? Does it not make of the judiciary a dependent, and not an independent, branch of government? Does it not constitute power in the Governor to grant absolution to those who scout and scoff the authority of the court? That such a power would not generally be exercised by the Governor may be conceded, but is not the fact that its exercise would have such effect sufficient reason for believing that the people never intended to lodge the power with the Governor? Does not the power to pardon in such cases involve the power to nullify the authority of the court to enforce obedience, just as the power to tax involves the power to destroy? Does not the very purpose of the power, inherent in the courts, negative by the strongest implication the existence elsewhere of authority for its nullification? These are aspects of the question which it seems to us must receive consideration in any comprehensive or fundamental discussion of the subject.

"It was quite appropriate that the king should exercise the power of pardon in such cases, because in the early history of England the king was the repository of all sovereign power. He was the government. He established his own courts, and at times presided over them dispensing justice in person. Jones' Blackstone, book 1, pars. 374, 375. Formerly all writs and processes of the court were issued under the king's seal, and contempt of the king's court was therefore an affront to the king himself. He being the repository of all sovereign power, it followed as a logical consequence that he might forgive all offenses of a public nature, including offenses to his process, his seal, his courts. This was especially true in the early days, when the king personally sat in the court, and as the fiction of the 'ubiquitous presence of the king' still exists, the power to pardon offenses in the nature of contempt of court also obtains.

"But here we have a different idea of sovereignty. No one person possesses all sovereign power, and it is quite a different

matter for a Governor to forgive a contempt of court than for the king to exercise such prerogative. A contempt of court is an offense against a department of government entirely distinct and separate from the executive department, and just as supreme in its field as the Governor is in his. The power to punish for contempt must be regarded as a power conferred upon the courts by the people, for the reason that it has from the earliest times been regarded as an essential attribute of a court. It is the power which more than any other distinguishes a court from a mere board of arbitration. It is a power which springs into existence coincident with the establishment of the institution.

"In view of the consequences which might result from an exercise of the power to pardon those punished for criminal contempt, should such power be conceded to exist in the absence of a clear intention on the part of the people to vest it in the Governor? While the Constitution vests in the Governor power to grant pardons 'for all offenses except treason and cases of impeachment,' can it be said that contempt of court is an 'offense' within the meaning of the term as there used? While courts quite generally agree that contempt of court is in a sense a public offense, certain it is that it is not the ordinary public offense. It has never been suggested, for instance, that one accused of contempt is entitled to a trial by jury—a constitutional right secured to the ordinary offender. Neither is one so accused entitled to a change of venue—a statutory right secured to the ordinary offender. In these respects it is to be distinguished from the ordinary offense, and, in the last analysis, it is an offense against the public only because the offensive conduct interferes with the proper function of an independent branch of government which society has erected for its own purposes. It is an offense which tends to frustrate the administration of justice and to interfere with the operation of the courts.

"With the administration of justice, or the preservation of order in the courtroom, or the compelling of attendance of witnesses or juries, the Governor has nothing to do. While the Constitution enjoins the Governor to 'take care that the laws be faithfully executed,' he is charged with no duty of punishing for contempt of court, nor of preserving order in the courtroom, nor compelling obedience to the orders of the court. All duty as well as all power in this respect is lodged with the court, and the court itself is responsible to the people for the manner in which it makes use of the power conferred to enable it to accomplish the purposes of its creation. In the case of U. S. v. Wilson, 7 Pet. 150, at page 160, 8 L. Ed. 640, Chief Justice Marshall defined a pardon to be 'an act of grace, proceeding from the power intrusted with the execution of the laws, which exempts the individual, on whom it is bestowed, from the punishment the law inflicts for a crime he has committed.'

"As the Governor is charged with the duty of seeing that the laws be faithfully executed, it is in strict accordance with the theory of the power of pardon that he should have power to pardon offenders against the laws which it is his duty to execute. But should such power extend to offenses with respect to which he has no duty or concern? Does the power of one to pardon the violation of a law which it is not his duty to execute comport with the theory of the pardoning power? If the Governor is not charged with the duty of enforcing obedience to the orders of the court, on what theory should he have the power to forgive disobedience of those orders? The power of the sovereign to pardon is much like the power of an individual to remit a debt. A. may remit a debt owing to him by C., but B. is without power to remit the debt which C. owes to A. In the distribution of the powers of sovereignty among three independent, co-ordinate branches of government, we cannot safely compare the extent of the power vested in either branch with the power exercised by the king. As the king was the repository of all sovereign power, his exercise of any of that power could not interfere with sovereign power lodged elsewhere.

"But in this country, where government is divided into three independent branches, it is to be presumed that the people did not lodge in one department of government a part of the sovereign power the exercise of which would nullify a part of the sovereign power lodged in another department. Such a conflict of power would not result in an orderly administration of public affairs. It would create friction between the various departments of the government, which would not result in the peace or good order of society. Every learned expositor of the subject agrees that it was the purpose of the people adopting the form of government prevailing in this country to make each department of government absolutely independent, separate, and distinct from the

other, clothing it with full power to perform its peculiar functions and to accomplish the purposes of its creation. In view of this, the power of the Governor to pardon in contempt cases, thus clothing him with power to interfere with the orderly administration of justice and the maintenance of order of courts, should be conceded with the greatest caution.

"In speaking of the power of the executive to pardon legislative contempt, Story, in his work on the Constitution (volume 2 [5th Ed.] § 1503), states: 'It would seem to result from the principle on which the power of each branch of the Legislature to punish for contempts is founded, that the executive authority cannot interpose between them and the offender. The main object is to secure a purity, independence, and ability of the Legislature adequate to the discharge of all of their duties. If they can be overawed by force, or corrupted by largesses, or interrupted in their proceedings by violence, without the means of self-protection, it is obvious that they will soon be found incapable of legislating with wisdom or independence. If the executive should possess the power of pardoning any such offender, they would be wholly dependent upon his good will and pleasure for the exercise of their own powers. Thus, in effect, the rights of the people intrusted to them would be placed in perpetual jeopardy. The Constitution is silent in respect to the right of granting pardons in such cases, as it is in respect to the jurisdiction to punish for contempts. The latter arises by implication; and, to make it effectual, the former is excluded by implication.'

"Why is not this logic of Justice Story as pertinent to the power of the Governor to pardon for contempt of court as for contempt of the Legislature? Do not the reasons assigned by the learned author for denying the right of the executive to pardon the offense of legislative contempt apply with equal force to his right to pardon a contempt of court? Is it not equally true of the latter that the 'Constitution is silent in respect to the right of granting pardons in such cases, as it is in respect to the jurisdiction to punish for contempts? The latter arises by implication; and, to make it effectual, the former is excluded by implication.' We recognize the question as one of the gravest importance, and one to be decided only after the most serious deliberation. A postponement of its decision until it shall be squarely presented certainly will not jeopardize a correct determination.

"The foregoing discussion has been indulged, not for the purpose of embarrassing any further consideration by the court, but rather for the purpose of suggesting phases of the question which have not received judicial consideration, so far as we have been able to ascertain. It may be that there is sufficient answer to the questions which have been raised, and, if this be true, the court at such future time as they may be presented will be at liberty to give full weight and consideration thereto. If it was the purpose of the people to lodge the power with the Governor, their purpose in such respect should not be thwarted by the court. On the other hand, if it was the purpose of the people to vest in the courts full power and authority to carry out the objects of their creation, without embarrassment or interference from any quarter, the judiciary cannot, with fidelity to the trust reposed in it, yield the power of such interference even to a co-ordinate branch of the government. The questions of constitutional powers are questions which the courts must determine under our theory of government, and while, in a case like this, considerations of deference and courtesy might incline us to yield to the contentions of a co-ordinate branch of government, nevertheless fidelity to that great trust reposed in us requires that all such questions be resolved so as to effectuate the intent of the people and to preserve the symmetry and balance of the government of their creation. With these general remarks, submitted only for the purpose of stimulating thought and reflection upon the subject, we leave the decision of the question to a future occasion."

We agree with the logic and reasoning in the Nevitt and Verage Cases. We grant that the power of an executive to pardon for a criminal contempt was not involved in either case. Dicta are the natural targets for astute counsel, but a dictum well reasoned and solemnly pronounced carries conviction.

[2, 3] There is no federal common law. There are no offenses against the United States, save those declared to be such by Congress. The people could counterfeit with impunity were it not for legislation to the contrary. Murder on the navigable waters of the United States might be a pastime were it not for congressional action.

[4] The word "offense" in article 2, section 2, referring to the pardoning power of the President embraces only those offenses declared to be such by the solemn action of the legislative body. Contempt of court, al-

though maybe a crime at common law, is not an indictable offense under the acts of Congress because it is not expressly set forth in the Criminal Code (35 St. 1088) and is not in violation of any criminal statute of the federal government. Only those offenses are to be proceeded against by information or are indictable in the federal courts which are specifically made so by acts of Congress, since the common law crime of itself has no existence in the federal jurisdiction. U. S. v. Hudson, 11 U. S. (7 Cranch.) 32, 3 L. Ed. 259; U. S. v. Eaton, 144 U. S. 677, 12 S. Ct. 764, 36 L. Ed. 591. Mr. Justice Grier, in Moore v. People of the State of Illinois, 14 How. 13, 14 L. Ed. 306, said: "An offense, in its legal signification, means the transgression of a law."

It is quite unnecessary to cite the state court decisions, and decisions of the federal courts, holding that in matters of contempt proceedings the party charged is not entitled to a trial by jury. In Myers et al. v. U. S., 264 U. S. 95, 44 S. Ct. 272, 68 L. Ed. 577, decided February 18, 1924, by the Supreme Court of the United States, Mr. Justice McReynolds, said: "While contempt may be an offense against the law and subject to appropriate punishment, certain it is that since the foundation of our government proceedings to punish such offenses have been regarded as sui generis and not 'criminal prosecutions' within the Sixth Amendment or common understanding."

The Sixth Amendment to the Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed. * * * " It is difficult to appreciate how a contempt of court can be an offense against the United States "within the Sixth Amendment or common understanding," unless the contemnor may demand at all times "a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed."

The theory has been advanced that the pardoning power of the executive is the correlative of his duty to execute the laws and that it is fitting that he should be vested with the authority to grant pardons for offenses against laws which it is his duty to execute. The obvious answer is that contempts of court are offenses against the court; that the executive is not charged with enforcing obedience to the orders of the court, this duty being lodged exclusively with the court itself. Thus, one of the basic reasons for the existence of the pardoning power is lacking in cases of contempt of court. See State v. Verage, supra. The President, we are sure, would hesitate to pardon offenders punished for contempt of the Senate or House of Representatives of the United States.

To follow out the reasoning of Judge Sanborn and the Wisconsin court, assume the District Court had enjoined an officer of the United States from performing some affirmative act, and there was an abrupt and open violation of the court's order, and consequent punishment, is it to be considered with toleration that the President of the United States could substitute his judgment for that of the court, by pardoning the offender? The court itself might be obstinate, and recommit; the President, equally obstinate, again might pardon, and so on ad infinitum.

[5, 6] Prima facie such pardon power conflicts with the independence of the judicial branch of the government. The assumption of such power by the executive is an usurpation of authority, because of the separation of departments under our organic law; because even the king's pardoning power was restricted; because a contempt commitment is not reviewable on appeal except on the question of jurisdiction; because contempt is not a crime, and the power to punish it is not an exercise of criminal jurisdiction; and because pardons are addressed alone to criminal offenses. See article by Thos. J. Johnstone, Esq., 12 Law Notes, 185 (1909).

Decisions giving this right to the executive effect an anomaly in American institutions in view of our theory of departmental checks and balances. The functions and powers of the executive are specifically enumerated in the Constitution with the view of abrogating many prerogatives. Contempt of court is a special kind of public offense; an offense against the judiciary. See article by Wilbur Larramore, Esq., 13 Harvard Law Rev. 618. It has been urged that the President of the United States in the past, under the advice of the various Attorneys General, has exercised the power to pardon for contempt. All we have to say to meet this argument is that time and acquiescence cannot consecrate a wrong. Criminals surely have no vested rights in pardon privileges, and construction of the Constitution by the department usurping a power cannot control.

The right of pardon dates back almost to

tribal times. 49 American Law Review, 684; 28 Harvard Law Review, 647; Lieber's Civil Liberty and Self-Government, 433; Iredell in No. Car. Convention, 4 Elliott, 110, 114. Therefore, it may be claimed that there must be the power somewhere to review against the arbitrary action of the judges in matters of contempt.

"There is no liberty if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would then be the legislator. Were it joined to the executive power, the judge might behave with violence and oppression. There would be an end to everything, were the same man, or body, whether of the nobles or the people, to exercise those three powers, that of enacting laws, that of executing the public resolutions, and that of trying the causes of individuals." Montesquieu, Spirit of the Laws, bk. XI, c. 6.

"I venture to assert that the executive and the legislative departments might cease their operations for a given time with no other result than inconvenience. But the suspensions of the functions of the courts for one day would mean anarchy—when might and not right, would become the measure of civil liberty and of property rights." Thomas W. Shelton, Spirit of the Courts, 153.

If by recognizing the judicial branch of the government as independent and supreme within its own sphere, the people of this country have created a monster kin to that recounted in the Frankenstein romance; nevertheless, they have retained in their own hands the weapon with which to destroy it. Nineteen times has the fundamental law of the land been amended, and there is no limit to further amendment save the will of the people.

The question to be determined in this case has nothing to do with the propriety of the President's pardon, provided he had the right to exercise executive clemency. This court is concerned only with the organic power of the President to pardon litigants who have been punished for contempt. We have to decide whether the pardon once issued, can avail the defendant to protect him against the order of the court.

We believe that contempt is a genus of open disregard for orders of the court, and that whatever the species or variety, defiance is intended and involved, and that in no case, in the absence of clearly expressed powers to the executive, can pardon be granted to the offending party if punished. The rules of procedure which have been read into the law of contempts are in no way controlling. It was necessary to formulate some code. It was not inconsistent for the judiciary to borrow analogies from the criminal law, because those particular rules were reasonably applicable to contempt procedure, and because those rules were indicative of a tested public opinion. Doing so, the judiciary merely evinced a desire not to administer the law of contempt in a despotic manner.

The miscellaneous statements of contempt as a "public offense" are not in any way fatal. Words are valueless save as expressing a particular idea. Language is only a medium of communication. The purpose of the words "public offense" was to express the antithesis of "private" offense. Such expression does not change the fact, fairly obvious, that contempt is an offense against the judiciary. The measure of power is in the possibility of its exercise, rather than in its actual exercise. So it is no answer to say that the President would not abuse the power if it were so extended. The clear constitutional separation of departments was not based upon possibilities.

As in the case of many constitutional problems, this is really a politico-legal question. It involves the delicate weighing of competing and apparently conflicting interests of great import. The executive and judicial departments of government are at odds over the allotment of power, and the judiciary must make the decision. Such a question should be approached with great hesitation. It is the duty of the judiciary to determine this particular controversy, if possible, with a foresight which will preserve those fundamental principles of government which form our most sacred heritage.

The present situation is not relieved of embarrassment by the circumstance that the solution is not so vital to the executive, as to the judiciary. However, if the power thus to pardon is denied, it merely means a restriction upon the general powers of the executive. To allow such power in the executive is to strike a death blow at the independence of the judiciary. The power to punish for contempts is inherent in, and essential to, the very existence of the judiciary. If the President is allowed to substitute his discretion for that of the courts in this vital matter, then truly the President becomes the ultimate source of judicial authority. Such a holding would be a distor--

tion of that cardinal principle of American institutions that the executive, legislative, and judicial branches of government are co-ordinate and proudly independent.

We are of the opinion that under the Constitution "the executive cannot draw to himself all the real judicial power of the nation by controlling the inherent and essential attribute of that power—the authority to punish for disobedience of the orders of the courts."

The motion of the defendant, based upon the presidential pardon, to modify the order of this court, so as to eliminate the jail sentence is denied, and the marshal is ordered to take the defendant into custody, and an order of commitment may issue.

WILKERSON, District Judge. I agree with everything which Judge CARPENTER has said. The question involved is of great importance. I shall not attempt to add to the reasons which have been stated fully, but I would emphasize some considerations which have compelled me to reach the conclusion announced in this case. To determine whether or not contempt of court is to be looked upon as an offense against the United States, we must consider the relation of the power to punish for contempt to the performance by judicial authority of its duty under the Constitution to preserve the limitations therein prescribed upon the exercise of power by the legislative and executive departments of the government.

Speaking of judicial authority Chief Justice White said: "While as to practically every other power created, checks and balances of various kinds were resorted to to limit the mode of the exercise of the power or to give sanction to it when exerted, as to the power to interpret and enforce the Constitution conferred upon, or recognized as existing in, judicial authority, no checks were interposed and no sanction whatever was ordained concerning its exertion, the power great as it was, therefore, in its ultimate conception, being made to rest solely upon the approval of a free people." Rep. Am. Bar Ass'n 1914, p. 115.

Speaking of the inherent power of courts to punish for contempt the same great jurist in Ex parte Hudgings, 249 U. S. 378, 383, 39 S. Ct. 337, 339 (63 L. Ed. 656, 11 A. L. R. 333) said: "Its great and only purpose is to secure judicial authority from obstruction in the performance of its duties to the end that means appropriate for the preservation and enforcement of the Constitution may be secured."

The courts do not derive this power to punish for contempt from any statute. The obstructive act need not amount to a violation of any law of the United States. Speaking of section 268 of the Judicial Code the Supreme Court in Toledo Newspaper Co. v. United States, 247 U. S. 402, 418, 38 S. Ct. 560, 564 (62 L. Ed. 1186), said: "Clarified by the matters expounded and the ruling made in the Marshall Case [Marshall v. Gordon, 243 U. S. 521, 548], there can be no doubt that the provision conferred no power not already granted and imposed no limitations not already existing. In other words, it served but to plainly mark the boundaries of the existing authority resulting from and controlled by the grants which the Constitution made and the limitations which it imposed. * * * The provision therefore, conformably to the whole history of the country, not minimizing the constitutional limitations nor restricting or qualifying the powers granted, by necessary implication recognized and sanctioned the existence of the right of self-preservation; that is, the power to restrain acts tending to obstruct and prevent the untrammeled and unprejudiced exercise of the judicial power given by summarily treating such acts as a contempt and punishing accordingly. The test, therefore, is the character of the act and its direct tendency to prevent and obstruct the discharge of judicial duty. * * *" See United States v. Shipp, 203 U. S. 563, 572, 27 S. Ct. 165, 51 L. Ed. 319, 8 Ann. Cas. 265.

The distinction between a statutory offense and a contumacious obstruction of judicial authority has been frequently pointed out. In the Debs Case, 158 U. S. 564, 594, 15 S. Ct. 900, 910 (39 L. Ed. 1092), it was said: "The acts of the defendants may or may not have been violations of the criminal law. * * * If any criminal prosecution be brought against them for the criminal offenses alleged in the bill of complaint, * * * it will be no defense to such prosecution that they disobeyed the orders of injunction served upon them and have been punished for such disobedience."

And in Re Chapman, 166 U. S. 661, 672, 17 S. Ct. 677, 681 (41 L. Ed. 1154): "Indictable statutory offenses may be punished as such, while the offenders may likewise be subjected to punishment for the same acts as contempts, the two being diverso intuitu and capable of standing together" (citing cases).

Having in mind the basis of the inherent power to punish for contempt and the ulti-

mate purpose of its exercise, is it possible to view an obstruction of judicial authority as an "offense against the United States" within the meaning of the constitutional provision, conferring the pardoning power upon the head of the executive department? May the head of the executive department grant amnesty to those who defy the courts in the performance of their duty to preserve the limitations upon the exercise of power prescribed by the Constitution? In a government of limited powers, like ours, there must be some tribunal which is supreme when controversies arise as to the extent of the authority conferred upon the agents through which the powers of government are exercised. That tribunal, under our plan of government, is the system of federal courts, the Supreme Court at its head. To give to the executive department power to make nugatory the mandates of the courts and thereby to strip them of the substance and leave to them only the shadow of authority in protecting the Constitution is precisely the same thing in its relation to our plan of government as to give to the legislative department power to override judgments against unconstitutional statutes and thereby amend the Constitution by acts of Congress.

If the President has the power to grant the pardon in this case, what becomes of the sanctity of decrees against confiscatory acts of the agents of government, state and national? What becomes of injunctive orders under the interstate commerce, antitrust and kindred statutes? What becomes of the authority of the courts to protect the citizen in the exercise of the rights guaranteed to him by the Constitution, against irreparable injury to life and property? It was well said that the power to tax is the power to destroy; it is just as true that the power to pardon for contempt is the power to destroy judicial authority.

Nor is it permissible to draw an artificial distinction based upon the method which must be employed or the form of the mandate which must be used in dealing with obstructions of judicial power. As was stated by Chief Justice White in Toledo Newspaper Co. v. United States, supra: "The test * * * is the character of the act and its direct tendency to prevent and obstruct the discharge of judicial duties."

Judicial authority is destroyed and the function of the courts as the guardians of the Constitution is impaired in just the same way by an act in defiance of the court's prohibition as by the refusal to perform an act until compelled by the court. In matters of procedure there may be some basis for the distinction between civil and criminal contempts. So far as they touch the inherent power of the court and affect it in the performance of its duty to preserve constitutional limitations upon the exercise of power, there is no distinction.

The Opinions of the Attorneys General of the United States in 1841, 1845, and 1852, holding that the power of the President to pardon embraced cases of contempt of court proceeded upon the erroneous assumption that, under our plan of government, the President stood in a relation to the courts somewhat similar to that of the king to the courts of England. They gave no consideration to the place of judicial authority in our plan of government. They ignored the relation of the inherent power to punish for contempt to the preservation of constitutional limitations and the protection of constitutional rights. They cannot be reconciled with the reasoning of Chief Justice White in the three opinions above cited. Whatever weight may be claimed for them under the rule of practical construction is destroyed by the principles laid down by the Supreme Court with reference to the relation of the independent exercise of judicial authority to the protection of the Constitution. If the three opinions of Chief Justice White to which reference is made above are sound, it is impossible to sustain the act of the President in this case as a valid exercise of his power under the Constitution.

The only course open to us is to follow the logic of those opinions and to enter an order accordingly.