INTERSTATE TRACTOR & EQUIPMENT
CO. v. THE MYLARK et al.
Civ. No. 5061.

United States District Court
D. Oregon.
March 24, 1950.

Erskine B. Wood (Wood, Matthiessen & Wood), Portland, Oregon, for respondent.

MacCormac Snow, Portland, Oregon, James Castles, Portland, Oregon, and A. C. Fulton, Astoria, Oregon, for intervening libelants.

SOLOMON, District Judge.

On July 10, 1948, claimant, Malarkey Logging Company, agreed to sell, and one R. B. Cutting agreed to purchase, a fishing vessel known as the M. S. Mylark for the sum of $30,000.00 payable as follows: twenty-five percent of the gross catch but not less than $6,000.00 a year beginning July 9, 1949, title to remain in the seller until the full purchase price was paid.

Because of Cutting's failure to make the required payments, claimant repossessed the vessel in September 1949. Thereafter Interstate Tractor & Equipment Co. filed a libel against the vessel, and a number of other creditors intervened claiming liens for repairs, supplies, labor, and other necessaries furnished the vessel during the time the vessel was in the possession of Cutting.

The vessel was sold by order of the Court and the proceeds in the registry of the Court are sufficient to pay in full all claims of the libelant and the intervening libelants.

The claims of the libelant and the claims of the intervening libelants, with the exception of Point Adams Packing Co. and Englund Marine Supply Co., were either paid in full or compromised. The only remaining

controversy is between the claimant and the intervening libelants whose demands have not been compromised.

The intervening libelants claim that they are entitled to maritime liens on the vessel by reason of the fact that the supplies furnished were necessaries within the meaning of the Ship Mortgage Act, 1920, and that such supplies were ordered by Cutting on the credit of the vessel and that Cutting, being a contract purchaser, was the person authorized to bind the vessel.

Claimants deny such claims and allege that Cutting had no authority to bind the vessel for necessaries by reason of the fact that the claimants had knowledge or, by the exercise of reasonable diligence, could have ascertained that Cutting was purchasing the vessel under a contract which deprived him of such authority.

The intervening libelants claim that they had no knowledge of such contract or its terms; and, since the contract had not been filed, recorded, or indexed in the office of the Collector of Customs or in the office of the County Clerk at Astoria, Oregon, the home port of the vessel, and had not been noted on any of the ship's papers, they were deprived of the opportunity to ascertain the contents of such contract.

The Ship Mortgage Act, 1920, 46 U.S.C.A. §§ 911–984, provides:

Sec. 971. "Any person furnishing repairs, supplies * * * or other necessaries, to any vessel * * * upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

Sec. 972. "The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted," shall be presumed to have such authority.

Sec. 973. "The officers and agents of a vessel specified in section 972 of this title shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel." However, another portion of the same section provides, "Nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel."

The contract between claimant and Cutting contained the following provision: "The purchaser shall keep the vessel in good condition and repair, free and clear of all liens and encumbrances and he shall pay all of the taxes levied against the vessel or its operations before they become delinquent. The purchaser shall not mortgage, pledge, or otherwise transfer or dispose of his interest in the vessel."

Claimants contend that the construction of such language is governed by United States v. Carver, 260 U.S. 482, 43 S.Ct. 181, 67 L.Ed. 361, and by the following cases, all of which adhere to the rule laid down in the Carver case: United States v. Voelp, 4 Cir., 296 F. 119. The Westhaven, D. C., 297 F. 534, affirmed Old Dominion S. S. Co. v. U. S., 4 Cir., 3 F.2d 1021, Standard Oil Co. v. U. S., 4 Cir., 1 F.2d 961, Frey & Sons v. U. S., 4 Cir., 1 F.2d 963, North Coast Stevedoring Co. v. U. S., 9 Cir., 17 F.2d 874.

In the Carver case: "The United States owned the vessels, but they were in the possession of the corporation under charters by which the corporation was to pay all costs and expenses incident to the use and operation of the vessels, and 'will not suffer nor permit to be continued any lien, incumbrance, or charge which [has or] might have priority over the title and interest of the owner in said vessel.' It was stipulated further that in any event within fifteen days the charterer would make adequate provision for the satisfaction or discharge of every claim that might have priority over the title, &c., or would cause such vessel to be discharged from such lien in any event within fifteen days after it was imposed." The Court construed this language to mean that the charterer "will not suffer any lien nor permit the same to be continued," and that "a lien shall not be imposed."

In the Carver case, as well as in all of the other cases above cited, the libelants claimed liens on vessels which were being purchased on contract from the United States Shipping Board Emergency Fleet Corporation and in each of such cases, with the exception of the Voelp case, the Court in its opinion set out the provision in the agreement construed in the Carver case dealing with liens and encumbrances, which provision was part of the standard form of agreement adopted by the Shipping Board for conditional sales as well as charter parties. The Anna E. Morse, 3 Cir., 286 F. 794, 800.

The Frey case, after referring to such provision, stated: "There may be doubt whether this provision of the contract, standing alone, forbade the creation of a lien on the vessel by the conditional purchaser; but we think all doubt is dispelled by another provision of the contract for the sale of the vessel: 'The buyer agrees to carry a properly certified copy of this agreement with the ship's papers, and to take such other appropriate steps designated to it by the seller from time to time as required by circumstances as will give notice to the world that the buyer has no right, power, nor authority to suffer or permit to be imposed on or against the vessel any liens or claims which might be deemed superior to or a charge against the interest of the seller in the vessel.'" [1 F.2d 964]

Such additional provision makes it abundantly clear that the seller intended to deprive the contract purchaser of authority to permit the creation of maritime liens.

It is significant that in each of the cases cited by claimant, other than the Carver and Voelp cases, the same provision was either set out in full or referred to in the opinion.

In the Voelp case, the Court, in referring to the Shipping Board Agreement, stated: "The buyer agreed to keep the property free from all liens and incumbrances," [296 F. 120] and, on the authority of the Carver case, held that the buyer "was forbidden by the terms of the * * * conditional sale to allow any lien to be put upon the vessel." Nowhere in the opinion is the language of the agreement set out, but I think it reasonable to assume that the standard form of Shipping Board agreement was used.

An examination of the scores of cases which have cited the Carver case indicates that Courts have frequently attempted to harmonize, distinguish, and limit its holding and those Courts which have followed it have done so without enthusiasm.

In the case of United States v. Robins Dry Dock & Repair Co., 1 Cir., 13 F.2d 808, 810, which construed the standard form of Shipping Board agreement, the Trial Court stated: "The doctrine of the Carver Case should not be extended," and the Appellate Court stated: "The rule laid down by the Supreme Court in the Carver Case may * * * impose a greater burden upon the lienors than any case brought to our attention; but we feel compelled to follow [it] as it has been followed in the cases we have cited."

The intervening libelants urge that the construction of the agreement involved herein is to be governed by the interpretation which was given to a similar agreement construed in the case of Munson Inland Water Lines v. Seidl, 7 Cir., 71 F.2d 791, 793, certiorari denied Farley v. Seidl, 293 U.S. 606, 55 S.Ct. 123, 79 L.Ed. 697. In that case, the agreement provided: "The purchaser hereby undertakes and agrees to keep said vessels free and clear of liens throughout the period they may be in his possession, and while the title thereto remains in the Seller." Subsection (e) further provided: "Such bills of sale to be made by the Seller and delivered to the Purchaser upon completion of the payment of the purchase price, shall convey title to each of said vessels 'as is, where is,' but must contain the usual warranty that they are free, and clear of all liens as of the date of this agreement, *but subject to such liens, if any, as may be created during the time they are in the possession of the purchaser, * * ***"

In construing this contract the Court held:

"We are convinced that an agreement, to exclude liability for liens created by the master, must be so worded as to necessitate the construction that a lien may not be created. In short the agreement must express-

ly deny to the vendee authority to create a lien.

"In the case before us the purchaser agreed to 'keep said vessel free and clear of liens.' While it must be admitted that the word 'keep' is suggestive of origin of lien as well as prompt satisfaction of lien, it does not expressly negative all power of creation of a lien, or to use the language of the Carver decision, does 'not *suffer* any lien or permit to be continued any lien.'"

The Court apparently placed some reliance upon subsection (e) of the conditional sales contract for it stated: "In construing the contract before us, it is necessary to read subdivision (f) and subdivision (e) together. Reading one in the light of the other, we find no express negation of the right to create a lien. Rather do they invite the conclusion that the parties contracted that the purchaser would promptly satisfy and discharge any lien which the successful operation of the vessel might necessitate."

It is doubtful whether such provision aids in the construction of the quoted section but, if it does, then the contract involved in this case may be likewise distinguished for paragraph III provides that, upon payment of the purchase price, "the seller shall execute and deliver to the purchaser a good and sufficient bill of sale in the usual form and with the usual warranties."

A bill of sale with the usual warranties provides for the transfer of the property "free and clear of all liens and encumbrances except those created by the purchaser or suffered or permitted by him on and after the date of the agreement." Therefore, the agreement in this case is practically identical with the agreement construed in the Seidl case.

It is significant that the contract did not provide for the recordation or filing of the agreement in the office of the County Clerk and the office of the Collector of Customs at Astoria, or its maintenance among the ship's papers. Likewise the agreement did not employ language similar to that in the Carver case nor did it expressly deny to Cutting the authority to create a maritime lien. The statement that, "The Purchaser shall keep the vessel in good condition and repair free and clear of all liens and encumbrances," standing alone, or when construed with other language in the agreement, does not clearly and unambiguously show that the contract purchaser was without authority to bind the vessel for supplies and other necessaries furnished by material-men.

■ The agreement between claimant and Cutting was drafted by claimant's attorneys. Ambiguities in meaning must, therefore, be resolved against claimant.

I am impressed with Mr. Justice Hughes' statements in the case of Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co. of California, 310 U.S. 268, 280, 60 S.Ct. 937, 943, 84 L.Ed. 1197, that: "We are of the opinion that it would thwart the purpose of the statute to compel the material-man furnishing supplies to the vessel to resolve the ambiguities which may be found in such charters as those here involved. The statute was intended to afford the material-man a reasonably certain criterion. The owner has a simple and ready means of protection. All that it is necessary for him to do, as the material-man in dealing with the charterer is charged with notice of the charter, is to provide therein that the creation of maritime liens is prohibited. When the owner does not do so, he should not be heard to complain when it appears that it is the charterer's business to obtain supplies to keep the vessel on her way and the charter has not prohibited reliance upon the credit of the vessel."

■ I find that Cutting had the authority to lien the vessel for necessaries and, having so found, I need not consider the evidence as to whether or not the intervening libelants knew, or by the exercise of reasonable diligence could have ascertained, that an agreement for the sale of the vessel existed and the terms thereof.

■■ Claimants contend that the claim of intervening libelant, Point Adams Packing Co., of $500.00 to pay for a live crab tank was not made upon the credit of the vessel because it expected to be reimbursed out of future deliveries of fish. Claimant also contends that, because the vessel was being fished on a lay basis, the claims for

groceries, fishing tackle, and fuel oil may not form the basis of a maritime lien. The testimony showed that these items were purchased by Cutting, the contract purchaser, who was likewise the master of the vessel. It is well settled that a supplier does not waive his lien on the vessel by also relying on the credit of the owner or charterer. The Everosa, 1 Cir., 93 F.2d 732, 735; Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 254 U. S. 1, 41 S.Ct. 1, 65 L.Ed. 97. Neither is the supplier deprived of a lien because the vessel was being fished on a lay basis. The Dirigo First, D. C., 60 F.Supp. 675.

All of the items furnished by the intervening libelants and their assignor were necessaries within the meaning of Section 971 of the Ship Mortgage Act, 1920, and intervening libelant, Point Adams Packing Co., did not waive its lien.

Counsel for intervening libelants, in accordance with this opinion, shall prepare findings and a decree without costs.